UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN  DIVISION


ALEXANDER CHRISTIAN BOWERS,

                Petitioner,            Case No. 1:13-cv-696

v.                                  Honorable Robert J. Jonker

PEOPLE OF THE STATE OF
MICHIGAN,

                Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a bench trial in the Ingham County Circuit Court, the court found Petitioner guilty of  first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(2)(b).   On December 8, 2010, the court sentenced Petitioner to imprisonment of 25 to 50 years.

        Petitioner raises the following four grounds for habeas corpus relief:

I.      The trial court violated Petitioner's Sixth Amendment right to a public trial by closing the entire trial to the public.

II.     The evidence was not sufficient to convict Petitioner of first-degree criminal sexual conduct.

III.    The prosecution violated Petitioner's right to due process by using perjured testimony.

IV.    Petitioner's trial counsel did not provide effective assistance, for reasons described in Petitioner's brief attached to the petition.

(Pet., ECF No. 1, Page ID#4-9.)  Respondent has filed an answer to the petition (ECF No. 10) stating that the grounds should be denied because they are without merit.  Upon review and applying the

AEDPA standards, the Court finds that the petition should be denied for failure to raise a meritorious federal claim.

### Factual Allegations & Procedural History

A. **Trial Court Proceedings**

Petitioner was accused of sexually assaulting eleven-year-old Mahognee Robinson at her home in Lansing Township on July 4, 2009. Following a preliminary examination, Petitioner was bound over for trial on one count of CSC I. A bench trial was held on November 8 and 9, 2010.[1]

The prosecutor's first witness, Bobby Robinson, testified that he lived at 312 Rosemary in Lansing Township with his wife, Dawn, and three daughters – Lori (16 years old), Mahognee (12 years old) and Vanessa (16 years old). (Tr. I, 9-10.) Robinson testified that he met Petitioner, who was nicknamed Alley Cat, through Jamon Walker, who dated one of his daughters. (Tr. I, 10.) During the summer of 2009, Robinson let Petitioner move into the basement for a couple of weeks because he was homeless. (Tr. I, 12-13, 25.) The Robinsons had a party at their home on July 4, 2009, with family and friends, including Petitioner. (Tr. I, 14.) Around dusk, Mahognee left with Jeanette, Robinson's 21-year-old daughter, to go watch the fireworks. (Tr. I, 15.) The party at Robinson's house ended around 9:00 p.m., and he locked the doors before going to bed. (Tr. I, 15-16, 26-27.) The house had a front door and a back door. (Tr. I, 18-19.) Petitioner and his wife were the only ones home at that time. (Tr. I, 27-28.) Mahognee returned home from the fireworks around 11:30 p.m. or 12:00 a.m. She came in with her key and knocked on her parents' door to tell

---

[1]The trial transcripts will be referred to as follows:

Bench Trial Volume 1, November 8, 2010 (ECF No. 15) - "Tr. I"
Bench Trial Volume 2, November 9, 2010 (ECF No. 16) - "Tr. II"

them that she was home.  (Tr. I, 17-18.)  Mahagonee and Lori shared a bedroom across the hall from

their parents.  (Tr. I, 18, 28.)  Lori also knocked on her parents door when she got home around

12:30 p.m.  (Tr. I, 29.)  Petitioner was still living in the basement at that time.  (Tr. I, 19.)  He moved

out the following week.  (*Id.*)  Robinson's daughters each had a key to the house, but Petitioner did

not have a key.  Robinson had instructed Petitioner not to knock on the door after 10:00 p.m.  (Tr. I,

30.)  After July 4, Robinson installed a deadbolt on the front door because it was too easy to get in

with only the lock on the door knob.  (Tr. I, 35-36.)  The Robinsons had two dogs that usually barked

when someone came into the house.  (Tr. I, 16.)

Robinson testified that on January 15, 2010, he heard Mahognee start screaming and

yelling.  (Tr. I, 20-21.)  He went to the room where Mahognee, Lori and Jamon were watching a

movie.  Mahognee was very upset and distraught.  (Tr. I, 21.)  After speaking with them, Robinson

called the police.  (Tr. I, 22.)  Robinson noticed that Mahognee had been very jumpy between July 4,

2009 and January 15, 2010.  (Tr. I, 24.)  Robinson testified that he and Dawn did their laundry twice

a week at the laundromat.  (Tr. I, 32.)  They did not notice any bloody clothing or sheets when they

were doing laundry in early July.  (*Id.*)  Robinson did not have any known problems with Petitioner

during the time he stayed at their home.  (Tr. I, 33, 37.)

Lori Robinson testified that she met Petitioner through Jamon and had known him

for a year or two.  (Tr. I, 42.)  According to Lori, Petitioner did not move into their house until late

July and lived with them until about September.  (Tr. I, 56.)   On July 4, Lori hung out with

Petitioner and her boyfriend, Jamon.  (Tr. I, 40.)  They were at her house for a little while and then

went to Petitioner's house at 3:00 or 4:00 p.m.  (Tr. I, 42-43, 51.)  They came back to her house

around 8:30 p.m.  (Tr. I, 42-43; 52-53.)  Lori's mother and God-brother, Sergio, were in the kitchen

and her Dad was outside barbequing.  (Tr. I, 45.)  Lori assumed that Mahognee was still out at the

fireworks.  (Tr. I, 46.)  Lori, Jamon and Petitioner went next door to Amanda's house at about 9:00

p.m. (Tr. I, 53.) Lori came home briefly from Amanda's house around 10:00 or 10:30 p.m. to change

into some pajama pants.  (Tr. I, 46-47, 54.)  She knocked on her parents' bedroom door and told

them she was home.  (Tr. I, 59-60.)  It took about two minutes to get from Amanda's house to her

house.  (Tr. I, 50.)  Mahognee was in her bed sleeping.  She was wearing her clothes – a blue shirt,

red tank top and denim capri pants.  (Tr. I, 47.)  Lori told her to get up and change her clothes, but

Mahognee did not answer.  (*Id*.)  Lori left through the front door to go back to Amanda's house.

(Tr. I, 48.)  She turned the lock, but explained that you could shake the door open or use a credit card

to open it when it was locked.  (*Id*.)  When Lori went home to change her clothes, Petitioner and

Jamon were next door at Amanda's with ten or fifteen other people.  (Tr. I, 48, 50.)  Petitioner was

drinking "Four Loko," an energy drink with 12 percent alcohol.  (Tr. I, 32.)  Lori saw him drinking

one at his mother's house and another at the neighbor's house.  (Tr. I, 43-44.)  Lori stayed at

Amanda's until the next morning.  (Tr. I, 49.)  She slept for periods of time.  (Tr. I, 50.)  Petitioner

also was at Amanda's house in the morning, but she could not be certain whether he was there the

entire night.  (Tr. I, 55, 59.)  When Lori returned home the next morning, Mahognee was sleeping

in her bed.  (Tr. I, 50.)  She had changed into basketball shorts.  (*Id*.)  Lori testified that Petitioner

and Mahognee did not seem to like each other.  (Tr. I, 45, 55-56.)  She described "little kid petty

stuff," like not wanting to watch the same thing on TV or Mahognee telling him to get out of her

room.  (Tr. I, 45.)

    Officer Chad Davis of the Lansing Township Police Department testified that on

January 15, 2010, at about 9:00 p.m., he was dispatched to 312 Rosemary Street to take a CSC

report.  (Tr. I, 62-63, 69.)  Davis testified that Bobby Robinson, who Davis had met, was waiting for

him on the lawn.  Bobby was very upset and angry.  When Davis went inside the house, Dawn and

Mahognee Robinson also were very upset and crying.  (Tr. I, 64.)  Davis interviewed Mahognee for

about ten minutes.  Her parents were present during the interview, but Davis asked them not to

interrupt.  (Tr. I, 65-66.)  After speaking with Mahognee and her parents, Petitioner was identified

as a suspect.  (Tr. I, 66-67.)  Davis and Sergeant Berenske made contact with Petitioner at Amanda's

house that evening.  (Tr. I, 67.)  Berenske conducted an interview.  (*Id*.)  Davis did not collect the

clothing that Mahognee was wearing the night of the alleged sexual assault because six months had

passed and the clothing had been washed.  (Tr. I, 70-71.)  Davis arranged a forensic interview for

Mahognee with Dr. Guertin.  (Tr. I, 68.)

       Mahognee Robinson testified that she was twelve-years-old at the time of trial, and

was eleven-years-old on July 4, 2009.  (Tr. I, 74.)  Mahognee went to the fireworks that night with

her sister, Jeannette, and returned home at about 1:00 a.m.  (Tr. I, 79.)  She told her parents that she

was home and locked the front door.  (Tr. I, 80-81.)  When Mahognee got home, her parents were

in their bedroom with the dog and Lori was in the bedroom she shared with Mahognee.  (Tr. I, 81.)

Lori was going to Amanda's house, but Mahognee was tired and wanted to go to bed.  (Tr. I, 82.)

When Lori left around 2:00 a.m., Mahognee was wearing a blue shirt with a red tank top underneath

and some capri pants.  She fell sleep wearing the same clothes.  (*Id*.)  Mahognee had known

Petitioner for a month or two and he was living in the basement of their home on July 4.  (Tr. I, 83.)

Mahognee testified that she did not like Petitioner because he looked at her funny, and told her

parents that she did not want him living with them.  (*Id*.)  Mahognee had not seen Petitioner on

July 4 and did not think he was in the house when she went to bed.  (Tr. I, 84.)

While she was sleeping, Mahognee heard someone come into the bedroom and slammed the door.  (Tr. I, 84-85.)  Petitioner turned on the light and asked if she knew where Lori and Jamon were.  (Tr. I, 85-86.)  Mahognee noticed that Petitioner seemed drunk and had a "Four" drink in his hand, which she described as an energy drink with alcohol in it.  (Tr. I, 86-87.)  Mahognee told him that she had no idea and suggested that he go over to Amanda's house.  (Tr. I, 85.)  Petitioner turned off the light and left the room, but came back a few minutes later.  (Tr. I, 87-89.)  The light was off when Petitioner came back the second time, but she could tell that it was him from the light coming through her window.  (Tr. I, 89.)  Mahognee's family had two dogs.  The little one, Mucho, usually slept with her, but slept with her parents that night.  (Tr. I, 77-78, 81.)  The dog usually barked when people were in the house, but Mahognee did not hear the dog bark when Petitioner came in her room that night.  (Tr. I, 108.)  Petitioner put his drink down on the dresser and sat down on the edge of her bed.  When she asked him what he wanted, he put his left hand over her mouth tightly, squeezing her face.  (Tr. I, 90.)  Mahognee testified that if Officer Davis' report said that Petitioner covered her mouth with his right hand, that was incorrect.  (Tr. I, 112.)  She could feel Petitioner's long fingers on her face.  (Tr. I, 90.)  With one hand over her mouth, Petitioner got on top of her and used his other hand to pull her pants and underwear down to her knees.  (Tr. I, 91-92.)  He then pulled down his pants, pushed her legs open and put his penis in her vagina.  (Tr. I, 91-92.)  Mahognee moved around and kicked her feet, but Petitioner would not get off of her.  (Tr. I, 93-94.)  At that time, she was 5'2" tall and weighed 95 pounds.  (Tr. I, 117.)  He told Mahognee that he would kill her and her family if she told anyone.  (Tr. I, 91, 93.)  When Petitioner was finished, he took his drink and left the room.  (Tr. I, 94.)

Mahognee testified that she had never had sexual intercourse; the furthest she had ever gotten with a boy before that night was a kiss on the cheek.  (Tr. I, 94.)  After Petitioner left her room, Mahognee went to the bathroom and put her clothes in the laundry.  (*Id*.)  She went "pee" and saw blood when she wiped herself.  (Tr. I, 91, 95.)  She "felt kind of gross" after that and took a shower.  (Tr. I, 95-96.)  She did not check to see if there was blood on her sheets.  (Tr. I, 115-16.)  Mahognee knew that it was Petitioner in her room because she saw his face and recognized him by his other physical characteristics, including his voice.  (Tr. I, 95-96, 118-19.)  She never saw Petitioner at her house again after that night.  (Tr. I, 96.)  Mahognee did not tell her parents because she was scared that Petitioner would kill her family as he had threatened.  (*Id*.)  Several months later when Mahognee was watching a movie with her sister, she got upset and turned off the TV when a little girl was about to get raped like she had been.  (Tr. I, 99-98.)  At that point, Mahognee told her sister what had happened with Petitioner.  (Tr. I, 98-99.)  Her sister starting crying really hard and jumped up and down.  (Tr. I, 99.)  Mahognee told her parents and talked to a police officer that night.  (Tr. I, 100.)  Mahognee testified that while she did not particularly like Petitioner, she did not make up what happened that night because of that.  (Tr. I, 100-101.)

Dr. Stephen Guertin testified as an expert in the area of child sexual abuse, physical signs and symptoms.  (Tr. II, 7.)  Dr. Guertin interviewed and examined Mahognee on January 22, 2010.  (Tr. II, 11.)  Magohnee's mother was present, but did not interfere with the interview.  (Tr. II, 12.)  Mahognee told Dr. Guertin that her menstrual period had started before the incident in this case occurred, which was significant because children who have menstrual periods have a hymen that is much more dispensable than pre-pubertal children.  Consequently, full penile/vaginal intercourse could occur without causing injury.  (Tr. II, 15-16.)  Mahognee described the sexual assault to Dr. Guertin much the same way as she did in her trial testimony, although she told him that

-7-

when Petitioner came back in her room the second time, he started "sweet talking" her. (Tr. II, 16-17.) Mahognee told Dr. Guertin that the vaginal penetration was very painful for her. (Tr. II, 17.) She also indicated that she had never let anyone put anything inside her vagina. (Tr. II, 19-20.)

Dr. Guertin testified that, during the physical examination, he found two abnormalities indicating that Mahognee had been sexually molested or had intercourse. (Tr. II, 21-22.) First, there was a gap in the hymen at the 7 o'clock position, which was a tear all the way through the hymen to the base. (Tr. II, 21.) Second, the opening to the vagina was markedly enlarged, over 25 millimeters. (Tr. II, 21-22.) According to Dr. Guertin, the history provided by Magohnee was consistent with his physical findings. (Tr. II, 27.) Dr. Guertin testified that in Mahognee's case, the tearing of the hymen could result in minor, but not significant, bleeding. (Tr. II, 23-24.) Other than the history provided by the patient, Dr. Guertin could not be certain when the tear in the hymen occurred. (Tr. II, 26.)

At the conclusion of trial, the trial court made findings of fact and concluded that there was proof beyond a reasonable doubt that Petitioner was guilty of CSC I with a person under 13 years of age when he was 17 years of age or older. (Tr. II, 42-48.) On December 8, 2010, Petitioner was sentenced to serve a sentence of 25 to 50 years. (Sentencing Transcript, (S. Tr.), 5, ECF No. 17.)

B.    **Direct Appeal**

Petitioner appealed the judgment of conviction and sentence to the Michigan Court of Appeals, raising the same claims now presented in his habeas petition. (*See* Def.-Appellant's Br. on Appeal, ECF No. 19.) The brief, filed by appellate counsel on June 10, 2011, raised only one claim - that defense counsel was ineffective for failing to call an expert witness to testify as to the

physical examination and a child psychologist to testify as to the situational factors that could cause a child to fabricate allegations of sexual assault.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 19.) Petitioner subsequently filed a "Standard 4" brief raising the same four claims now presented in his habeas petition.  (*See* Def.-Appellant's Standard 4 Br. on Appeal, ECF No. 19.)  In an unpublished opinion issued on January 24, 2012, the court of appeals rejected Petitioner's claims of insufficient evidence, prosecutorial misconduct and ineffective assistance of counsel, but remanded the case to the trial court for further proceedings on Petitioner's claim that the trial court improperly closed the courtroom to the public during the complainant's testimony because the trial court "did not make sufficient factual findings for us to review."  (*See* 1/24/12 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 19.)  After the remand, the Michigan Court of Appeals issued an opinion rejecting Petitioner's remaining claim on appeal.  (*See* 5/3/12 MCOA Op. After Remand, ECF No. 19.) Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which was denied on October 22, 2012, because the Court was not persuaded that the questions presented should be reviewed by that court.  (*See* Mich. Ord., ECF No. 27.)  The Michigan Supreme Court denied Petitioner's motion for reconsideration on January 25, 2013.

## C.  **Post-Conviction Relief**

Petitioner filed a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules.  The motion was denied on May 10, 2013.  According to Petitioner, he did not appeal the denial of that motion because the claims that he raised therein "lacked merit." (Pet., ECF No. 1, Page ID#4.)

**Standard of Review**

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-

court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

   A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 83, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular . . . case." *Williams*, 529 U.S. at 407. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no

-11-

'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706-07 (quoting *Harrington*, 562 U.S. at 103).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

<u>**Discussion**</u>

I.      **Right to Public Trial**

In his first ground for habeas corpus relief, Petitioner contends that the trial court violated his Sixth Amendment right to a public trial by closing the entire trial to the public.  He also asserts that the trial court violated the public's First Amendment rights to present at the criminal trial by closing the entire trial to the public.

-12-

Before opening arguments, the prosecution moved to close the courtroom while the complainant testified.  The prosecutor stated in part:

> I did file a motion and notice of intent regarding a closed courtroom of the testimony of the minor victim as well as having a support person sit with her pursuant to Michigan law.  There is a statute that allows it.  We do think it's appropriate in this case and that it is in the best interest of the child to have the courtroom closed due to the nature of the testimony and have a support person with her.

(Tr. I, 4.)  The trial court asked Defense counsel if there was any objection, and counsel responded, "No, your Honor.  Thank you."  (*Id.* at 4-5.)  The trial court concluded by stating, "So the courtroom will be closed then to all persons not necessary to the proceedings during the minor victim's testimony."  (*Id.* at 5.)

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI; *see also In re Oliver*, 333 U.S. 257, 278 (1948) (holding this right to be binding on the states through the due process clause of the Fourteenth Amendment).  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (internal quotation marks and citations omitted).  Because of the "'great, though intangible, societal loss that flows' from closing courthouse doors," the denial of a right to a public trial is considered a structural error for which prejudice is presumed. *Id*. at 50 n.9 (quoting *People v. Jones*, 391 N.E. 2d 1335, 1340 (N.Y. 1979)).  In light of these concerns, to justify the closure of a courtroom over the objections of a defendant, "the party seeking to close [a public] hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than

necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48 (applying the test set forth in *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984), to a Sixth Amendment public trial claim).

The Michigan Court of Appeals found that the trial court's failure to make findings of fact consistent with *Waller* constituted constitutional error, but did not require reversal.  Rather, the court remanded the case to the trial court for additional factual findings, stating:

> Defendant argues that he was deprived of his constitutional right to a public trial when the trial court locked the courtroom to the public.  The right to a public trial is a structural constitutional right, which is not subject to harmless error analysis and requires automatic reversal. *Arizona v Fulminante*, 499 US 279, 309-310; 111 S CT 1246 (1991); *Neder v US*, 527 US 1, 7; 119 S Ct 1827 (1999).  However, we must first decide how to review this issue given defense counsel's actions during trial.  In order to properly preserve a matter for appellate review in a criminal hearing, the issue must be raised before the trial court.  *People v Dupree*, 486 Mich 693, 703; 788 NW2d 399 (2010). This generally requires that a party timely object to the decision or action disputed on appeal. *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006). Although a forfeited right may later be reviewed for plain error, a voluntary relinquishment of a known right generally creates a waiver that extinguishes the right; otherwise, this would allow a party to "harbor error as an appellate parachute." *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000); *People v Dobek*, 274 Mich App 58, 65; 732 NW2d 546 (2007).

> Before opening arguments, plaintiff moved to close the courtroom while the complainant testified. The trial court asked defendant if he had an objection to plaintiff's motion, and  defendant's attorney responded, "No, your Honor. Thank you." Therefore, it appears that defendant voluntarily waived his right to contest this issue.  However, we note that our Supreme Court has not yet decided whether a structural constitutional right may ever be waived; that issue is currently under consideration. See *People v Vaughn*, 291 Mich App 183; 804 NW2d 764 (2010), lv gtd 490 Mich 887; 804 NW2d 118 (2011).  Thus, given the current uncertainty concerning the effect of defense counsel's actions, as well as the fact that defendant raises a concurrent claim of ineffective assistance concerning this issue, we will treat this issue as preserved.  This Court reviews de novo any trial court decision that invokes constitutional questions or statutory interpretations. *People v Rose*, 289 Mich App 499, 505; ___ NW2d ___ (2010).

-14-

Criminal defendants are constitutionally entitled to a public trial; this right may only be abrogated under limited circumstances. US Const, Am 6; *Waller v Georgia*, 467 US 39, 48-49; 104 S Ct 2210; 81 L Ed 2d 31 (1984). MCL 600.2163a(15) and (16) permit a party to move for special arrangements to protect the welfare of a witness; one such arrangement is to close the courtroom and exclude unnecessary parties during the witness's testimony. In order to do so, the trial court must make findings on the record to establish that the special arrangement is: (1) justified by the government's substantial interest (for partial closure) or a compelling interest (for total closure); and is (2) is narrowly tailored towards protecting the welfare of the witness. MCL 600.2163(a)(16); *People v Kline*, 197 Mich App 165, 168-171; 494 NW2d 756 (1992). Specifically, the court must weigh the following factors against the right of the accused to a public trial: (1) the age of the witness; (2) the nature of the offense; and (3) the potential harm to the witness. *Id*. at 171.

Here, the trial court made no findings of fact to establish the government's superseding interest in protecting the witness; in so doing, the trial court committed clear constitutional error. Nevertheless, where the closure order is narrowly drawn, reversal is not required prior to a determination that defendant's right to a public trial outweighed the interest asserted by the government in protecting the complaining witness. *Kline*, 197 Mich App at 172; *see also Waller*, 467 US at 49-50 (stating that automatic reversal is not warranted for violations of the right to a public trial, and that the remedy should be proportionate to the violation). Under similar circumstances to the present case, the *Kline* court recognized "that a defendant is not required to show prejudice to obtain relief for a violation of the right to a public trial," but held that the failure to make appropriate factual findings at the time of the closure did not require reversal. *Kline*, 197 Mich App at 172. Instead, the *Kline* court found that remanding the case for additional factual findings while retaining jurisdiction to determine whether the (in that case partial) closure was justified under the circumstances was the proper remedy for the defendant, under circumstances where the trial court's closure order itself was narrowly drawn. *Id*. at 172.

Although the trial court in the case at bar does not specify the type of closure, it closed the courtroom only during the complainant's testimony and stated that "the courtroom will be closed then to all persons not necessary to the proceeding during the minor victim's testimony."[2] While it could be argued that the trial court adopted plaintiff's argument in its motion, since the court decided the issue immediately after plaintiff moved to close the courtroom, this is not explicitly set forth in the trial court's decision. Therefore, we remand for factual findings as required by *Kline*, after which we can properly review the question of whether the closure violated defendant's rights. "Remanding the case to the trial court will fully protect defendant's rights." *Kline*, 197 Mich App at 172.[3]

-15-

[2] To the extent defendant asserts that the entire trial was closed to the public, the record does not support defendant's argument.

[3] Defendant also attempts to assert that the public's First Amendment rights were violated because the court closed the trial to the press and the public. However, defendant lacks standing to assert the alleged violation of the public's right to attend the trial, since he was not injured in a "manner differently [from] the citizenry at large." *Rohde v Ann Arbor Public Schools*, 265 Mich App 702, 705; 698 NW2d 402 (2005).

(MCOA Op. 3-4.)  After remand, the court of appeals found that the trial court made sufficient findings of fact to justify the closure of the courtroom during the victim's testimony.  The court stated:

> We previously remanded this case in order for the trial court to state on the record the factual findings upon which it concluded that the courtroom should be closed during the complainant's testimony.  *People v Bowers*, unpublished opinion per curiam of the Court of Appeals issued January 24, 2012 (Docket No. 301811). We conclude that under the circumstances, the trial court did not violate defendant's right to a public trial.
>
> * * *

On remand, the trial court stated:

> The victim . . . was twelve years old at the time she testified. . . . She was eleven years old when the alleged acts occurred.  And the alleged – well, the offense involved one count of criminal sexual conduct in the first degree involving sexual penetration against a child under the age of thirteen, the Defendant being an adult at that time.  And the testimony was certainly expected and was, in fact, especially sensitive, and it would be difficult for the minor child, and the parents also requested it on behalf of the minor child.
>
> * * *
>
> So it was to protect the victim from further . . . embarrassment and shame from – you know, in testifying regarding sensitive issues in front of strangers.

The court also stated that it did not consider allowing the public to watch the complainant's testimony from outside the courtroom via closed circuit television, at least in part because no one requested such a measure.

-16-

The trial court addressed the three factors described in *Kline* and concluded that there were sufficient grounds to justify a partial closure of the courtroom. We do not find that the trial court clearly erred in its factual findings, and agree that under the circumstances as found by the trial court, it was permissible to close the courtroom during the complainant's testimony.

(MCOA Op. on Remand, 1-2.)

Petitioner's Sixth Amendment claim fails on alternative grounds. It is undisputed that defense counsel affirmatively consented to the closure of the courtroom during the complaint's testimony. Although the right to a public trial is a fundamental right, it can also be waived if a habeas petitioner either acquiesces to the closure of the courtroom or fails to object. *See Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009) (citing *Freytag v. Commissioner*, 501 U.S. 868, 896 (1991)) ("[T]he Sixth Amendment right to a trial that is 'public,' provide[s] benefits to the entire society more important than many structural guarantees; but if the litigant does not assert [it] in a timely fashion, he is foreclosed."); *Peretz v. United States*, 501 U.S. 923, 936–37 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960)); *see also U.S. v. Reagan*, 725 F.3d 471, 488–89 (5th Cir. 2013) (defendants waived claim that right to public trial violated by the closing of the courtroom during voir dire, hence, claim unreviewable on appellate review); *U.S. v. Christi*, 682 F.3d 138, 142–43 (1st Cir. 2012) (defendant waived any claim of error in court limiting public access to courtroom during most of jury instructions by counsel's failure to object); *U.S. v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012) (defendant may forfeit the right to a public trial, either by affirmatively waiving it or by failing to assert it in a timely fashion). Petitioner, therefore, waived his claim by agreeing to the closure.[2]

---

[2]The Michigan Court of Appeals considered the issue preserved for appeal because it was unclear whether a structural right could be waived under Michigan law. The court of appeals' decision to consider the issue preserved does not negate the waiver jurisprudence established by the United States Supreme Court. Had the Michigan Court of Appeals

Petitioner's failure to object to the closure not only resulted in a waiver of the claim, but distinguishes his case from *Waller*, which is the seminal case regarding the public trial guarantee. In that case, the trial court, over the defendant's objection, closed the entire seven-day suppression hearing to all persons other than witnesses, court personnel, the parties, and counsel. The very first sentence of *Waller* highlights that the Supreme Court was considering only a closure of the courtroom over a defendant's objection: "Th[is] case[ ] require[s] us to decide the extent to which a hearing on a motion to suppress evidence may be closed to the public *over the objection* of the defendant consistent with the Sixth and Fourteenth Amendment right to a public trial." *Waller*, 467 U.S. at 40–41 (emphasis added). Likewise, the Supreme Court's holding was limited to a closure over the objection of a defendant: "In sum, we hold that under the Sixth Amendment any closure of a suppression hearing *over the objections* of the accused must meet the [*Waller* Inquiry and Required Findings]." *Id*. at 47 (emphasis added). In *Presley v. Georgia*, 558 U.S. 209, 210 (2010), the Supreme Court reaffirmed that a trial court must make the *Waller* inquiry and required findings before closing pre-trial proceedings, including voir dire, over the objection of the defendant.

In order to grant habeas corpus relief, this Court must find a violation of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d). In determining what constitutes clearly established Supreme Court precedent, the lower federal courts may not "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Marshall v. Rodgers*, __ U.S.__, 133 S. Ct. 1446, 1451 (2013); *see also Lopez v. Smith*, 135 S. Ct. 1, 3 (2014). Because the *Waller* Court specifically mentioned an objection by the

---

found the issue unpreserved for appellate review, it would have been both waived and procedurally defaulted. *See, e.g., Durr v. McLaren*, No. 2:12–CV–14691, 2015 WL 927455 at *4-5 (E.D. Mich. Mar. 4, 2015).

defendant both when framing the issue for decision and when summarizing its holding, it would be too far a reach for this Court to find the requirements set forth in *Waller* to be clearly established in a case such as this where the defendant did not object to the closure.   Other district courts considering the question have reached the same conclusion.   *See e.g., Duffy v. Florida Attorney General and Secretary*, 2:15-cv-149-FtM-29MRM, 2016 WL 4193870, at *8 (M.D. Florida Sept. 9, 2016) ("Petitioner has advanced no clearly established Supreme Court case indicating that a state court is required to make *Waller* findings, in the absence of an objection, to the partial closing of a courtroom during a minor child's testimony); *Pouncy v. Palmer*, No. 13-cv-14695, 2015 WL 4429547, at *9 (E.D. Mich. July 20, 2015) ("Supreme Court precedent does not clearly establish that a trial court must make the *Waller* Inquiry and Required Findings even where the defendant does not object."); *Bolan v. LaRose*, No. 1:13-cv-00857, 2014 WL 4955806, at *18 (N.D. Ohio Sept. 30, 2014) (finding no clearly established federal law indicating the trial court was required to make *Waller* findings in light of the petitioner's failure to object to closure of the courtroom).   In the absence of clearly established Supreme Court precedent supporting Petitioner's claim, this Court cannot grant habeas relief.

Likewise, there is no clearly established Supreme Court precedent supporting Petitioner's argument that he should not be bound by his attorney's waiver because it was not knowing, intelligent and voluntary.   Various federal circuit courts have held that "[a] defendant's attorney's waiver of the right to a public trial is effective on the defendant."   *United States v. Hitt*, 473 F. 3d 146, 155 (5th Cir. 2006) (citing *United States v. Sorrentino*, 175 F.2d 721, 723 (3rd Cir. 1949)); *Martineau v. Perrin*, 601 F.2d 1196, 1200–01 (1st Cir. 1979)).   The Sixth Circuit in *Johnson*, 586 F.3d at 489, essentially acknowledged that the petitioner's right to a public trial had been waived

by counsel's failure to object to the closure of the courtroom.  The Supreme Court has yet to hold

that an attorney cannot waive his client's right to a public trial.  *See Guyton v. Butler*, 490 F. App'x

331, 333 (11th Cir. 2012).   Indeed, the Second Circuit has noted that "[t]here is no clearly

established binding precedent [from the Supreme Court] as to either whether personal waiver of the

right to a public trial is constitutionally required, or as to whether waiver by counsel requires

consultation with a client." *Daughtry v. Greiner*, No. 01–2466, 2002 WL 31819589, at *1 (2nd Cir.

Dec. 16, 2002) (unpublished).  Thus, to the extent that Petitioner argues that his public trial claim

was not effectively waived because he did not personally waive this right, habeas relief is precluded

because of the lack of clearly established Supreme Court precedent regarding whether a defendant

must personally waive his public trial right or whether, if the right is to be waived by counsel, there

must be consultation with the defendant.  *Id*.

Petitioner also asserts that the closure violated the public's First Amendment rights

to be present at the criminal trial.  As noted by the Michigan Court of Appeals, Petitioner lacks

standing to assert the constitutional rights of others.  *See McGowan v. Maryland*, 366 U.S. 420, 429

(1961); *Newsom v Norris*, 888 F.2d 371, 381 (6th Cir. 1989).  Petitioner, therefore, is not entitled

to habeas corpus relief.

## II.  **Sufficiency of the Evidence**

In his second ground for habeas relief, Petitioner contends that there was insufficient

evidence to find Petitioner guilty of CSC I beyond a reasonable doubt.  Petitioner essentially argues

that, in light of the numerous "conflicts and contradiction" in the testimony provided by the victim

and other prosecutorial witnesses, there was insufficient "reliable" evidence to support his

conviction.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals rejected Petitioner's claim of insufficient evidence, stating:

> Defendant next argues that the evidence presented at trial was insufficient to convict defendant of CSC1 beyond a reasonable doubt. While this Court reviews the trial court's verdict de novo under a challenge based on the sufficiency of the evidence, this Court must also consider all the evidence in the light most favorable to plaintiff. *People v Kissner*, ___ Mich App ___; ___ NW2d ___ (Docket No. 296766, 2011). In so doing, this Court must determine whether a reasonable factfinder could determine that each element of the crime was proven beyond a reasonable doubt. *Id.* We defer to the factfinder's credibility determinations, reasonable inferences and factual findings from the record. *Id.* Since defendant must establish that the evidence is insufficient to support a conviction, plaintiff "need not negate every reasonable theory consistent with innocence." *Id.* [citation omitted.]
>
> Michigan has defined the elements of CSC1 in pertinent part as follows:
>
> (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> (a) That other person is under 13 years of age. [MCL 750.520b.]
>
> Sexual penetration has further been defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r); *People v Szalma*, 487 Mich 708, 725; 790 NW2d 662 (2010). A person over the age of 17 years who commits CSC against a person below the age of 13 years may be sentenced to prison for a term ranging from twenty-five years to life. MCL 750.520b(2)(b). Since CSC is a general intent crime, no showing of sexual purpose is necessary for a conviction. *Szalma*, 487 Mich at 725.
>
> When viewing the facts in the light most favorable to the prosecution, it is clear that the prosecutor satisfied each element of CSC1 to support defendant's conviction. It is beyond dispute that the complainant was less than 13 years old at the time of the assault and that defendant was more than 17 years old at that time. The complainant testified that she saw defendant's face and identified him by clothing, height, hair, and the drink he was carrying before defendant initiated the assault. She testified that defendant put his penis inside her vagina while threatening to kill her family if she told anyone; this act qualifies as sexual penetration under the statute. Although the timetables testified to by the witnesses concerning the events of the evening were somewhat variable, it is reasonable for a factfinder to conclude

-22-

that these minor errors were based on the lapse of time between the assault and the trial date.  The complainant's testimony was also consistent with Guertin's medical findings.  Since a rational factfinder could determine that each element of the crime had been proven beyond a reasonable doubt, defendant's assertion that the evidence was insufficient is meritless.

(MCOA Op. 4-5.)

The decision of the Michigan Court of Appeals was patently reasonable.  The victim testified that she was under 13 years of age and that Petitioner penetrated her vagina with his penis.  (Tr. I, 74, 90-94.)   The victim testified that she was familiar with Petitioner and knew it was him because she saw his face and recognized him by his physical characteristics, including his hair, height and voice.  (Tr. I, 95-96, 118-19.)  In rendering its verdict, the trial court found the victim "was very credible during her testimony."  (Tr. II, 45.)  The reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the finder of fact.  *Glasser v. United States*, 315 U.S. 60, 80 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  Thus, the victim's testimony, viewed in the light most favorable to the prosecution, was sufficient to find Petitioner guilty of CSC I.

III.  **Prosecutorial Misconduct**

In Ground III, Petitioner contends that prosecutor committed misconduct by knowingly presenting perjured testimony by Bobby Robinson, Lori Robinson, Mahognee Robinson and Dr. Guertin.  Petitioner further argues that the prosecutor vouched for the credibility of prosecutorial witnesses and argued facts not in evidence.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Michigan Court of Appeals squarely rejected Petitioner's claim, stating:

> Defendant also argues that his due process rights were violated when the prosecution knowingly presented false testimony against defendant, which rendered his trial fundamentally unfair. In order to properly preserve a matter for appellate review in a criminal hearing, the issue must be raised before the trial court. *Dupree*, 486 Mich at 703. If a party fails to timely object to prosecutorial misconduct, the matter is waived on appeal unless: (1) a jury instruction could not have cured the prejudice to defendant; or (2) "failure to consider the issue would result in a miscarriage of justice" (plain error review). *People v Wells*, 238 Mich App 383, 390; 605 NW2d 374 (1999). Since defendant failed to object to any of plaintiff's alleged misconduct or to the inconsistent testimonies of the witnesses, we will not reverse unless an obvious error occurred that "resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Meissner*, ___ Mich App ___; ___ NW2d ___ (Docket No. 298780, 2011).

> While a prosecutor's role is to seek justice rather than mere convictions, the prosecutor has wide latitude on arguing facts—as well as reasonable inferences extrapolated from those facts—at trial. *People v Erb*, 48 Mich App 622, 631; 211 NW2d 51 (1973); *Dobek*, 274 Mich App at 66. A prosecutor may not argue facts not admitted into evidence during opening or closing arguments. *Meissner*, ___ Mich App at ___. The prosecution also is not allowed to "vouch for the credibility of his

witnesses to the effect that he has some special knowledge concerning a witness'[s] truthfulness." *People v Bennett*, 290 Mich App 465, 476-477; 802 NW2d 627 (2010) [citation omitted.]

Additionally, the prosecution has a duty to correct any known false testimony presented on the record. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). A conviction acquired through the prosecutor's known use of perjured testimony is a clear violation of a defendant's due process rights guaranteed under the US Constitution; the remedy for this violation is to vacate the conviction if there is any reasonable likelihood that the false testimony could have affected the factfinder's decision (i.e. it is material to the decision). *Id.*, US Const, Am 14. Perjury occurs when a person willfully swears falsely while under oath by statute. MCL 750.423; *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005).

Defendant's assertion of prosecutorial misconduct is meritless. First, he fails to demonstrate how inconsistent timelines and tangential factual differences between the witnesses regarding events that occurred approximately sixteen months prior to trial prove their testimony was willfully false. Although defendant casually asserts that the witnesses had a motive to lie, he offers no evidence to support his bald assertion aside from the complainant's distaste for defendant. To the contrary, the record establishes that the witnesses (other than the complainant) got along well with defendant, up until the time the sexual assault was reported. Defendant offers no possible explanation for why Guertin would lie on the stand, let alone how Guertin lied under oath. The only testimony that could possibly rise to perjury was Bobby's statement that he did not confront the witness on January 15, 2010, after discovering the assault; however, this inaccuracy is clearly not material to defendant's conviction.[4] Further, defendant's attorney cross-examined the witnesses regarding their inconsistencies and explored their credibility; therefore, defendant suffered no prejudice from any of this testimony because the trial court was able to weigh these matters when determining the credibility of the witnesses. Thus, the misstatements at trial, if any, are insufficient to grant defendant relief from the verdict.

Defendant's remaining arguments that plaintiff [sic] improperly vouched for the credibility of the witnesses and argued facts not in evidence are clearly false. The complainant testified during trial that she identified defendant based on his height, clothing, and hair. Further, plaintiff's assertion that people were entering and leaving the home during the night is a reasonable inference, based on the fact that: (1) a party was going on until the early evening; (2) the complainant returned home late that night; and (3) the complainant's sister returned and then left the home again. Additionally, defendant fails to point to any of plaintiff's statements in the record that improperly vouched for the credibility of the witnesses.[5]

[4] This statement contradicts the information contained in Officer Davis's police report. Regardless, the conflict between these two statements merely raises a

question of credibility; it does not provide the prosecution with ironclad knowledge that Bobby's statement on the record was false.

[5] Plaintiff's statement that the witnesses have no motive to lie was a general statement that was based on the fact that the witnesses got along with defendant until after the assault was reported; this too is a reasonable inference from the testimony presented at trial.

(MCOA Op. 5-6.)[3]

## A.    Use of perjured testimony

To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a petitioner must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).  Furthermore, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517–18 (6th Cir. 2000).  Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony by the prosecutor.  *Coe*, 161 F.3d at 343; *Malcum v. Burt*, 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003).  Additionally, the fact that a witness contradicts

---

[3]Respondent contends that Petitioner procedurally defaulted his claim by failing to raise a timely objection in the trial court to the prosecutor's alleged misconduct.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  In order to obtain habeas review of a defaulted claim, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986).  Petitioner argues ineffective assistance of counsel as cause for his failure to object to the prosecutor's misconduct.  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

-26-

himself or herself or changes his or her story also does not establish perjury either. *Malcum*, 276
F. Supp. 2d at 684.

　　　　　In this case, Petitioner's claim that the prosecutor presented false testimony clearly
is without merit.  Petitioner's claim rests entirely on the alleged inconsistencies in the witnesses'
testimony.  As the Michigan Court of Appeals reasonably found, Petitioner has made no showing
that the testimony was indisputably false.  Moreover, the inconsistencies alleged by Petitioner do not
establish that the prosecution knowingly used perjured testimony.  *See Coe*, 161 F.3d at 343;
*Malcum*, 276 F. Supp. 2d at 684.  Accordingly, the Court does not find habeas relief is warranted
relative to this claim of prosecutorial misconduct.

　　　　　　　　B.　　　**Improper vouching and arguing facts not in evidence**

　　　　　A prosecutor may not express a personal opinion concerning the guilt of a defendant
or the credibility of trial witnesses, because such personal assurances of guilt or vouching for the
veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly
inviting the jurors to convict the defendant on a basis other than a neutral independent assessment
of the record proof."  *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999) (internal citations
omitted).  The test for improperly vouching for a witness is whether the jury could reasonably
believe that the prosecutor was indicating a personal belief in the witness' credibility.  *United States
v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987).  "[G]enerally, improper vouching involves either
blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in
front of the jury or of the credibility and truthfulness of witnesses and their testimony."  *See United
States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (internal citations omitted).  While prosecutors
cannot offer personal opinions as to the credibility of witnesses, the guilt of the accused, or facts not

in evidence, prosecutors do enjoy wide latitude to "argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008).

As discussed by the Michigan Court of Appeals, Petitioner's claims that the prosecutor improperly vouched for the credibility of the complainant and arguing facts not in evidence are not supported by the record. Even if the prosecutor made improper comments, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Petitioner cannot show that the alleged misconduct prejudiced him during his bench trial. Unlike a jury, a trial judge, sitting as the trier of fact, possesses an understanding of the law, allowing him to ignore errors and decide a case based solely on evidence properly admitted at trial. *See United States v. Joseph*, 781 F.2d 549, 552 (6th Cir. 1986); *People v. Taylor*, 628 N.W.2d 55, 62 (Mich. Ct. App. 2001); *see also Hargrave-Thomas v. Yukins*, 236 F. Supp. 2d 750, 778-79 (E.D. Mich. 2002) (showing prejudice from prosecutorial misconduct in a bench trial is more difficult than demonstrating prejudice in a jury trial, because a judge presiding over a bench trial is presumed to know the law and apply it in rendering the verdict), *reversed and remanded on other grounds*, 374 F.3d 383 (6th Cir. 2004). Petitioner, therefore, is not entitled to habeas relief as the result of prosecutorial misconduct.

IV.     **Ineffective Assistance of Counsel**

In his final Ground for habeas corpus relief, Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's misconduct as alleged above, failing to object to the closure of the courtroom during the victim's testimony, failing to voir dire Dr. Guertin regarding his credentials and failing to call an expert to rebut Dr. Guertin's testimony.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*,  563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012)

(stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Applying the proper standard, the Michigan Court of Appeals rejected all of Petitioner's claims of ineffective assistance of counsel, with the exception of the claim related to the closure of the courtroom, which it reserved until after remand.  The court stated:

> A claim of ineffective assistance of counsel is "a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews the trial court's factual findings for clear error, while any constitutional determinations are reviewed de novo. *Id.*  Defendant preserved these issues when he moved this Court for a remand for an evidentiary hearing. *See People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).  However, because there was no Ginther[6] hearing below regarding ineffective assistance of counsel, this Court's review of defendant's claim is limited to mistakes apparent in the appellate record. *See People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000).

> Defendant bears a high burden in proving that his trial counsel was so deficient as to functionally deprive defendant of his right to effective counsel at trial. *Meissner*, ___ Mich App at ___.  An attorney's actions are presumed to be the result of sound trial strategy, and this burden is difficult to overcome. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).  The US Supreme Court has set forth a two-prong test to determine whether counsel was ineffective in a given case.  First, defendant must prove that his trial counsel failed to meet an objective standard of reasonableness. *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Second, defendant must establish prejudice, which is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The crux of this test is to determine whether the mistakes by defendant's counsel effectively deprived defendant of the right to a fair trial. *Meissner*, ___ Mich App at ___.  Since decisions involving the selection and presentation of evidence—including witnesses—at trial is a matter of trial strategy, the failure to call a witness can only rise to ineffective assistance of counsel when doing so "deprives defendant of a substantial defense." *People v Julian*, 171 Mich App 153, 159; 429 NW2d 615 (1988).

> Defendant argues that his counsel was ineffective because he failed to: (1) object to plaintiff's vouching for the witnesses' credibility; (2) object to plaintiff's use of facts not in evidence; (3) object to the courtroom closure; (4) voir dire Guertin regarding his credentials; and (5) call an expert witness.

As noted above, the record is absent of any evidence that plaintiff vouched for the witnesses' credibility or that plaintiff argued facts not in evidence. This issue has no merit.

Guertin's expert credentials were also lengthy and detailed; he has testified as an expert in this field (child sexual abuse and pediatrics) approximately 500 times all across the country (including Canada) since 1984. Accordingly, it would have been entirely futile to voir dire Guertin regarding his credentials, since the evidence overwhelmingly suggests that the trial court would admit Guertin as an expert witness. Defense counsel is not ineffective for failing to raise a meritless objection or advance a futile argument. *See People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Trial counsel did not act objectively unreasonably.

Although defendant's counsel did not call an expert witness, a decision on the presentation of evidence is a matter of trial strategy. In this case, defendant's counsel attempted to prevail by challenging the credibility of plaintiff's witnesses and arguing that defendant was not the perpetrator of the crime. Defendant has not pointed to a substantial defense that was forfeited by his counsel's failure to call an expert witness.

Defendant also argues that counsel's failure to object to the courtroom closure amounted to ineffective assistance of counsel. Because we have not determined whether an objection to the closure would have been meritorious, we reserve resolution of this question until the remand has been completed. As discussed above, a remand is consistent with the result in *Kline* to determine whether the trial court can satisfy the elements listed in *Kline* for closure of the courtroom.

[6] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

(MCOA Op. 6-7.)

## A.  **Failure to object to the prosecutor's misconduct**

The Court concluded above that the prosecutor did not engage in misconduct. Counsel's failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Yannott v. U.S.*, No. 95-1958, 1996 WL 279182, at *2 (6th Cir. May 23, 1996) (citing *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir.1986)); *see also United States v. Sanders*, 404 F.3d 980, 986 (6th Cir. 2005) (counsel cannot be ineffective for failing to object to what was properly done); *Harris v. United States*, 204 F.3d 681,

683 (6th Cir. 2000) (failure by counsel to do something that would have been futile is not ineffective assistance); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Strickland*.

        **B.**      **Failure to object to the closure of the courtroom during the victim's testimony**

In its January 24, 2012 opinion, the Michigan Court of appeals reserved this claim of ineffective assistance of counsel until after remand when it could determine whether an objection to the closure would have been meritorious. On remand, the court of appeals concluded that it was permissible to close the courtroom during the complainant's testimony, but did not specifically address Petitioner's claim of ineffective assistance of counsel. Arguably, by finding that the closure was permissible, the court of appeals implicitly found that counsel's failure to object was not constitutionally deficient. Even applying *de novo* review to Petitioner's claim because the court did not explicitly decide the issue, *Wiggins v. Smith*, 539 U.S. at 534, his claim must fail as counsel's performance was not objectively unreasonable.

Michigan law allows for closure of the courtroom under circumstances such this, where a minor child is testifying regarding a sexual assault. *See* MICH. COMP. LAWS § 600.2163a(16). Indeed, the Supreme Court has recognized the protection of the physical and psychological well-being of a minor is a compelling state interest in the context of a courtroom closure during a criminal trial involving forcible rape. *Global Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982). Consequently, counsel may have presumed that an objection would have been

futile.  This was especially true in the case of a bench trial where the defense would suffer no obvious harm from the partial closure.  As previously discussed, counsel cannot be deemed ineffective for failing to make a futile or meritless objection. *See O'Hara v. Brigano*, 499 F.3d at 506; *McQueen v. Scroggy*, 99 F.3d 1302, 1316 (6th Cir. 1996).  Petitioner, therefore, is not entitled to habeas relief as a result of counsel's failure to object to the closure.

> **C.**  **Failure to voir dire Dr. Guertin regarding his credentials and failure to call an expert**

Dr. Guertin's credentials overwhelmingly demonstrated that he was qualified to testify as an expert in the area of child sexual abuse, physical findings and symptoms.  (Tr. II, 4-6.)  Counsel's failure to engage in a futile line of questioning does not constitute ineffective assistance of counsel.  *See Harris*, 204 F.3d at 683.

Moreover, Petitioner cannot show that counsel was ineffective for failing to call a defense expert.  Petitioner contends that counsel should have called an expert to rebut the testimony of Dr. Guertin and/or should have called an expert to testify as to why Mahognee would have fabricated such an allegation.  Matters of trial strategy, such as determinations regarding which witnesses to present and what questions to ask, are presumed correct and are generally not evaluated in hindsight or second-guessed upon habeas review. *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996).  Habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation.  *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006).  Petitioner has offered no evidence to the court that there exists an expert who could have impeached Dr. Guertin's testimony or the victim's testimony concerning the sexual assault.  As the Supreme Court has observed, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*,

-33-

562 U.S. at 110.  "In many instances, cross-examination will be sufficient to expose defects in an expert's presentation." *Id*.  Defense counsel subjected Dr. Guertin's testimony to meaningful cross-examination.  (Tr II, 24-27.)  With regard to a motive for Mahognee to fabricate the allegations, counsel elicited testimony from Mahognee and other family members that Mahognee did not like Petitioner and highlighted that fact during his closing argument.  (Tr. I 55-56, 107;Tr. II, 36.)  Consequently, this Court cannot find that the decision of the Michigan Court of Appeals was unreasonable.

### Conclusion

In light of the foregoing, the Court will deny the petition for failure to raise a meritorious federal claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented

are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:      August 31, 2016              /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         CHIEF UNITED STATES DISTRICT JUDGE